1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4

5   UNITED STATES OF AMERICA,

6          Plaintiff,

7     v.                              CASE NO:  1:14-CR-50

8   BRADLEY MICHAEL ABBRING,

9          Defendant.

10   _____/

11                    * * * *

12                 SENTENCING HEARING

13                    * * * *

14

15     BEFORE:  THE HONORABLE PAUL L. MALONEY, CHIEF JUDGE
                 United States District Judge
16               Kalamazoo, Michigan
                 July 18, 2014
17
     APPEARANCES:
18
     APPEARING ON BEHALF OF THE PLAINTIFF:
19
         TESSA K. HESSMILLER
20       Assistant United States Attorney
         P.O. Box 208
21       Grand Rapids, Michigan  49501-0208

22   APPEARING ON BEHALF OF THE DEFENDANT:

23       GARY M. GABRY
         Hettinger & Hettinger, PC
24       200 Admiral Avenue
         Portage, Michigan  49002

25

2

1                           I N D E X

2   WITNESSES:                                              Page

3   RAYMOND SOWA - Government Witness

4   Direct Examination by Ms. Hessmiller                    15
    Cross Examination by Mr. Gabry                          19
5   Redirect Examination by Ms. Hessmiller                  22

6
    TIM KRUITHOFF - Government Witness
7
    Direct Examination by Ms. Hessmiller                    23
8   Cross Examination by Mr. Gabry                          29

9

10                              * * * *

11

12

13

14                      Kalamazoo, Michigan

15                        July 18, 2014

16                 at approximately 9:30 a.m.

17                      PROCEEDINGS

18          THE COURT:  This is File Number 14-50; The United

19   States of America vs. Bradley Abbring.  This matter is before

20   the Court for sentencing.

21          The Court's file reflects that on April 3rd, 2014,

22   the defendant pled guilty before Magistrate Judge Hugh W.

23   Brenneman to the offense of receipt of child pornography,

24   contrary to 18 U.S. Code 2252A(a)(2)(A).  The plea was accepted

25   by this Court on April 18, 2014.  The Court accepts the plea

1  agreement finding the charges pled to adequately reflect the

2  seriousness of the actual offense behavior.

3      There are objections to the presentence report

4  advisory guideline scoring, which the Court will get to

5  momentarily.

6      The Court has tentatively scored this case under the

7  advisory guidelines at Offense Level 37, Criminal History

8  Category I, which would ordinarily result in an advisory

9  guideline range of 210 to 262 months, however, because the

10  statutory maximum for this offense is 240 months, the advisory

11  guideline range is 210 to 240 months.

12      The record should reflect that Assistant United

13  States Attorney Tessa Hessmiller is here on behalf of the

14  government.  Attorney Gary Gabry is here on behalf of the

15  defendant.  The defendant is present in person.

16      Mr. Gabry, have you had ample opportunity, sir, of

17  reviewing the presentence report with your client.

18      MR. GABRY:  Yes, your Honor, I have.

19      THE COURT:  Subject to your objections, which we will

20  deal with momentarily, do you agree that the advisory guideline

21  range is 210 to 240 months?

22      MR. GABRY:  Yes, your Honor.

23      THE COURT:  Thank you.

24      Mr. Abbring, you've had ample opportunity of

25  reviewing the presentence report with your lawyer?

1          THE DEFENDANT:  Yes, I have, your Honor.

2          THE COURT:  Are you satisfied with his work and

3   representation of you?

4          THE DEFENDANT:  Yes, I am.

5          THE COURT:  Thank you.

6          Miss Hessmiller, do you concur in the scoring?

7          MS. HESSMILLER:  Yes, your Honor.

8          THE COURT:  Are you moving third level?

9          MS. HESSMILLER:  If the Court moves for the

10   acceptance of responsibility, your Honor.

11          THE COURT:  All right.  Thank you.

12          The Court will, for the moment, will take that under

13   advisement.  We will deal with the objections.

14          Mr. Gabry, as I understand it, you have two

15   objections, sir.  You may proceed.

16          MR. GABRY:  Thank you, your Honor.

17          Your Honor, the Court's had, I believe, certainly has

18   had an opportunity to look at the written support memorandum

19   that I filed with the Court.  These objections pertain to two

20   basic areas that deals with the general area of distribution,

21   and the fact that under the guidelines as scored, there was the

22   failure to reduce from 22 down to 18 or down to 20, and then

23   the additional scoring of two levels for the distribution, Sub

24   F, that there was no other factor of distribution.  I believe

25   in my objection, your Honor, I indicated those are kind of tie

1  barred together, and in examining the caselaw, what I tried to

2  summarize is that it seems in examining both historical

3  evolution of the distribution, I guess, offense variable

4  additions, to the guideline scoring, that we have evolved from

5  what originally started out as assessments being added because

6  of in looking-- I'm sure the Court has also had an opportunity

7  to review the United States Sentencing Commission's report

8  dated February 27, 2013, it's a huge report, 300-some pages.

9  In going through different parts of that report and

10  particularly looking at some of the recommendations made in the

11  summary, there was an interesting historical discussion about

12  the use of distribution and distribution being scored in cases

13  of receipt.  That being that distribution was originally

14  treated much more harshly because the method by which it was

15  done was generally through the mail, that receipt was being

16  charged because of the positive outcome of sting operations

17  done, and individuals were gaining through the mail the

18  pornographic material, and that it was a much different

19  technological world.  Starting from that point, we have now

20  expanded into what we know to be peer-to-peer networks.

21        There is no dispute, and I have not disputed that the

22  indication is that Mr. Abbring did use a peer-to-peer network,

23  known as Ares.  That he did have his files not on the

24  pornographic files, from my understanding of the forensic

25  evaluation, is that the pornographic files were removed from

1  the Ares share folder, the download folder, and were being kept

2  on this hard drive, this external hard drive.  In addition is

3  to that, we don't object and have indicated that the search

4  warrant affidavit found that, I believe it was Agent Kruithoff,

5  downloaded partial files over a period of time, I think on four

6  different occasions, if my memory serves me correctly.  It also

7  indicates that those downloads were not able to be completed.

8  No one has necessarily indicated from a forensic standpoint as

9  to why.  Mr. Abbring was pretty up front from the very

10  beginning when the search warrant was executed that he would

11  stop these downloads and that he would not keep the

12  pornography-- the child pornography in his share folder, he

13  would move it.  And that in that frame of mind-- with that

14  frame of mind, he didn't feel he distributed.  Now, I

15  understand we are talking about legal term of art and at some

16  point in time that came up for one of the issues acceptance of

17  responsibility I explained.  I think the distinction in my

18  mind.  What we are looking at now, however, is the legal issue,

19  and I don't dispute the fact that the definition says any act

20  that leads to the transfer of these types of files can be

21  scored as distribution.  Where my concern arises, your Honor,

22  is what we have here is actions by the defendant to stop the

23  distribution.  Yes, that's how he received the files.  Some

24  people receive them by writing a check and buying things at a

25  store behind a counter, some people purchase commercially on

1    the internet, and we have had clients that have been in front

2    of this Court that have done that before.  What has

3    exponentially grown as far as individuals obtaining these sites

4    are the fact that they can go on these peer-to-peer networks,

5    enter certain terms and get downloads.  The cases that I have

6    examined, with the exception of the one cited from the District

7    Court in Kansas, all in my examination of them, indicate that

8    these are individuals that got scored for distribution because

9    they had left these files in their computers, and that I think

10   the most recent unpublished case I saw out of the Sixth Circuit

11   talked about the fact that there were 26 files downloaded.  I

12   drew a distinction, on Mr. Abbring's behalf, that when he is

13   actively trying to stop the distribution, that there should be

14   some acknowledgment that he is not doing an act to allow the

15   distribution.

16          In the Ramos case, the judge-- no, it was in the

17   Bolton case, the Michigan case, Tommy Bolton, I had cited in my

18   brief, indicated that it was kind of like FaceBook.  The

19   district judge said well, you know, if you don't take certain

20   steps to protect against it, you put it out there, and yes,

21   anybody can pick it up, and that's distribution.

22          My contention is that Mr. Abbring's case, to score

23   him at 22 instead of 20 and then an additional two points for

24   the distribution, which raises this to actually four levels for

25   this act to allow the transfer when, in fact, his actions are

1   to deny that opportunity doesn't seem appropriate.

2       I can't cite any caselaw other than the fact that I

3   have not seen a case that says the mere use of the peer-to-peer

4   network in and of itself you score the plus two points.  Most

5   of the cases talk about the understanding of the network, and

6   that if you are going to use that network, these files are

7   going to be downloaded, they are going to be available to other

8   people, and if you know that and you do that, you are going to

9   get the two points.  Yes, Mr. Abbring knew that, but he took

10   actions to stop it from happening.  And so it's my contention

11   he should not receive the plus two points.

12       The second objection, your Honor-- it actually would

13   go up four levels.  No?  Yes.  Because it would be 22, is the

14   base, but then the guidelines indicate under specific offense

15   B-1, let's see, "The defendant did not intend to traffic in or

16   distribute such material, decrease by two levels."  And then

17   B-5, B-3(b) says, "Distribution other than distribution

18   described in subdivisions A through E increase by two levels."

19       The other area of concern that I objected to, your

20   Honor, was the fact that the probation officer has indicated to

21   the Court that she believes the Court should not grant the

22   points for acceptance of responsibility.  Again, I don't

23   dispute the issues that are pointed out by the probation

24   officer with the exception that as to her point four in the

25   basis for not recommending acceptance of responsibility-- I'm

1 sorry, point two, just bullet two is noted in the first

2 objection, "Mr. Abbring denies he distributed pornography,

3 which is relevant conduct in this case." He doesn't deny what

4 has happened here. He hasn't denied some partial files were

5 downloaded. He has denied that he's left files so that anybody

6 could pull them down. And so in wrestling with this, to me,

7 it's kind of like we are taking him out of civilian being

8 interviewed who is hearing well, did you distribute these

9 files? And he doesn't feel that he did, in that terminology.

10 Back in our day, people used to hear about B & E, well, I

11 didn't break in, the window was open, I just lifted it. We are

12 getting into that. He is not denying it, as far as relevant

13 conduct. I was present at the interview. He said some of the

14 things that he said. I pointed out--

15     THE COURT: I mean there is a significant aspect of

16 denial of relevant conduct here, isn't there?

17     MR. GABRY: Well, there is if you are talking about

18 the masturbation issue, your Honor. That is an area of

19 dispute. My client does not, has not indicated, even to his

20 therapist or to me or to the probation officer that he was

21 doing that to these files. It was reported in the police

22 report that the officers said that when he was being

23 questioned, he admitted that. Mr. Abbring indicates he

24 admitted masturbation. Under the circumstances, he didn't feel

25 that he was admitting it to child pornography.

1     THE COURT:  Well, isn't there also some inconsistent

2   statements regarding viewing the material itself?

3     MR. GABRY:  Not significantly, your Honor.  I mean

4   what he has indicated-- I mean again, what has been said?

5   Again, going back to the police report, he had indicated to the

6   officers that he didn't view many-- he did not view a

7   significant amount of those.  The number 20 came up, it's a

8   smaller number that he has indicated.  I've discussed it.

9     There's obviously a large quantity that was on this

10   hard drive.  He has indicated and been consistent from the

11   beginning that he could not view on his antiquated system many

12   of the movies that downloaded into a file, he couldn't then

13   open them up and play them.  And that he viewed some of the

14   images and that it sickened him, and he did not consistently or

15   go into all of those.  So in the area of 20, 30 there was

16   viewing, but it wasn't viewing, I guess, to the extent of the

17   number that we have seen.  The probation officer did conclude

18   that she basically didn't believe that, that she did not accept

19   that he didn't view all of these, and that he was downplaying

20   that.

21     Submitted in the sentencing memorandum is a report of

22   a therapist that worked with him.  Again, that appears to be

23   consistent with what Mr. Abbring has indicated.  First of all,

24   the psychological testing does indicate that they believe him

25   to be a truthful person, that he answers in a truthful way.

1   And when you are trying to, I guess, understand why he has so

2   many of these videos, why he has so many of these images, then

3   we blend into parts of his experience that we have outlined.

4   What happened.  The therapists do agree and, in fact, the

5   United States Sentencing Commission agrees in part, that not

6   everybody that views child pornography is doing it for

7   perversion reasons or because they are a pedophile or that they

8   get aroused by that kind of material.  That they do it for

9   stress, they do it in anxiety situations, and that's quoted in

10   my sentencing memorandum.

11          We have a situation here in which Mr. Abbring said to

12   his therapists, and unfortunately to many people, including a

13   state senator, that he would go on these searches to connect

14   with these victims, because he viewed himself as a victim, and

15   that he didn't feel that alone.

16          Now I understand, your Honor, that is not the norm

17   that we often see.  And from the beginning an indication, you

18   know, in my conversations with Mr. Kruithoff and the U.S.

19   Attorney, is there any indication that you can show me from the

20   examination that these files once put on the hard drive were,

21   in fact, then re-accessed and pulled up and looked at at some

22   point in time.  And again, to my knowledge, I haven't heard

23   that that's been identified.  So in that particular area, I

24   can't concede that he is in denial of relevant conduct.  We

25   find it difficult to believe that he would not have been

1  viewing more files than he says, but to my knowledge, he

2  admitted viewing files to the officers.  He didn't say I looked

3  at all of them, he in fact, said that he couldn't open them,

4  the movies and didn't view the movies.

5      So when we are talking about the issue of denial of

6  relevant conduct, it would be my contention that he has not

7  intentionally denied any relevant conduct.

8      The other aspects of the recommendation that the

9  Court not grant acceptance of responsibility deal,

10  unfortunately, with the correlation between the reality of what

11  will happen now that he is being prosecuted and how that is

12  going to affect his life.  And the fact that that was a primary

13  factor in the early stages of our negotiations and the efforts

14  made by myself and by the family in a number of areas which

15  I've, of course, indicated to the prosecutor I didn't

16  necessarily recommend or would try to rein in the family

17  members.

18      They are a middle class, never been in trouble

19  family.  And when we initially find out that these matters have

20  been seized and there isn't any clear indication that it's

21  going federal for some period of time where there was a

22  discussion that it was made clear that it was going to be

23  handled by the federal government and the ramifications of

24  handling a case under the federal guidelines versus the state

25  guidelines-- I know the Court's heard it before.  So that was

1  an issue.  And then when we began to realize that the policy of

2  the United States Attorney's Office was that they weren't going

3  to be looking at possession charges anymore.  And I certainly

4  understand Mr. Mekaru's position.  I understand why.  It's a

5  little difficult to convey that to a client, that they can't

6  get that break that had been given to others in the past, but

7  it is what it is.  And so the focus became this kind of, oh my

8  God, I'm going to prison, and I'm going to go for five years.

9  No, you could go for much longer than five years.  But the

10  Court has no ability to do anything but at least give that, and

11  how could that be changed.  Well, I have to fall on my sword to

12  some extent, because I indicated to my client the only people

13  that could change that would be Congress, the elected

14  officials.  It is the law.  It's not the judge's discretion.

15  The law says five years at least, and unless Congress does

16  something, unless the politicians do something to change that,

17  this Court's hands are tied by that.  So we get into the

18  situation where this man is scared, he is afraid of the impact

19  it's going to have on his family, his wife, his child, and he

20  reaches out.  I did attach the full email.  When I was asked

21  whether I wanted that at the discussion, I hadn't talked to my

22  client, I hadn't really pondered everything that was in it, and

23  I've decided to present it to the Court so that the Court can

24  read it in context.  Yes, he is, he wishes that there would

25  have been more leniency granted to him by the prosecutor's

1  office, but he doesn't feel this prosecutor railroaded him.  He

2  doesn't feel that he is an innocent man that was railroaded.

3  He feels that the statute railroads people.  Is that his--

4  Does that mean he doesn't accept responsibility?  Well, he did

5  it.

6       He stood up knowing full well that he was looking at

7  five, if not many more years than that, he did.  He has some

8  difficulty drawing a distinction originally between the fact

9  that the young ladies and young boys in these images are his

10  victims also, because as Dr. Flood indicated he relates to the

11  victims and the act on the victims.  Does he believe that they

12  are his victims?  If the Court would like to inquire, and I'm

13  sure at some point in time I know Mr. Abbring has a statement

14  that he wishes to read to the Court, the Court will see that he

15  does, he understands that he is hurting these children.  We had

16  discussions at length.  To say that he is not accepting

17  responsibility, that he is not remorseful, that he is

18  minimizing his behavior, he is not.  And I would hope that the

19  Court would, in looking at the basis for those objections,

20  decide after hearing from Mr. Abbring that he should receive

21  the benefit of the acceptance of responsibility.

22      THE COURT:  Thank you, counsel.

23      Miss Hessmiller.

24      MS. HESSMILLER:  Your Honor, the government has two

25  law enforcement witnesses that would be probably five minutes

1  each to address some of these factual issues, with the Court's

2  permission, I could go ahead and call those two law enforcement

3  agents.

4      THE COURT:  On what issue?

5      MS. HESSMILLER:  The first officer, your Honor, would

6  be Trooper Ray Sowa to talk about the contention that is in the

7  defense objection memo on Page 10 that states that Mr. Abbring

8  does not believe that he admitted to law enforcement that he

9  masturbated to the child pornography.

10      The second proposed witness, your Honor, would be

11  Special Agent Tim Kruithoff to talk about partial download

12  issue, and what is going on with why the officers were able to

13  get partial downloads, which is also a fact that was disputed

14  in the objection memo.

15      THE COURT:  All right.  Go ahead and proceed.  Call

16  your first witness.

17      MS. HESSMILLER:  Thank you, your Honor.

18      The government calls Michigan State Trooper Ray Sowa.

19      THE COURT:  Trooper, please step forward and be

20  sworn.

21      RAYMOND SOWA - GOVERNMENT WITNESS - SWORN

22      COURT CLERK:  State your full name and spell your

23  last name for the record.

24      THE DEFENDANT:  Raymond Sowa, S-o-w-a.

25          DIRECT EXAMINATION

1   BY MS. HESSMILLER:

2   Q.   Good morning, Trooper Sowa.

3   A.   Good morning.

4   Q.   Were you involved in the interview of Mr. Bradley Abbring

5   at his residence in conjunction with the execution of a search

6   warrant?

7   A.   Yes, I was.

8   Q.   Can you tell us what Mr. Abbring said regarding

9   downloading child pornography?

10  A.   He described it as an addiction, claimed that he was--

11  started looking at child pornography approximately six years

12  ago.  When I asked him about the masturbation, whether he would

13  masturbate, he confirmed that he did just a couple times.

14         When we were discussing the child pornography as a

15  whole within the interview, I made it very clear to him

16  anything that we discussed that day would be relevant to child

17  pornography, not adult pornography.

18  Q.   Is that your standard practice?

19  A.   It is.

20  Q.   At any point in this interview, did anything-- were you

21  focusing at all on adult pornography?

22  A.   No, ma'am.

23  Q.   So at the point where he was talking about downloading

24  images and movies, was that about adult pornography or child

25  pornography?

1   A.   Child pornography.

2   Q.   And you recall masturbation coming up in that interview?

3   A.   Yes, I do.

4   Q.   And the masturbation would have been about adult

5   pornography or child pornography?

6   A.   Child pornography.

7   Q.   He said he had been doing this for six years?

8   A.   Yes.  Yes, ma'am.

9   Q.   Did he say he had ever tried to stop?

10   A.   He did.

11   Q.   What did he say about that?

12   A.   I believe he said he quit looking at the child pornography

13   approximately one year, but it was just the easy access got him

14   right back into it.

15   Q.   Easy access to the movies?

16   A.   Yes, ma'am.

17   Q.   Of child pornography?

18   A.   Yes, ma'am.

19   Q.   So what did you take from him saying that he had been

20   doing this for six years and had stopped for a period of--

21   stopped looking at them for a period of one year?

22   A.   I took that as he was addicted to it.  I believe that we

23   discussed the addiction as that of a drug addict, except in his

24   case it was the child pornography.

25   Q.   Was he talking about being addicted to downloading and

1 saving these images and movies or viewing them?

2     MR. GABRY: I'm going to object, your Honor, unless

3 there is a foundation laid. I mean it's asking-- If it's

4 asking the witness what he said, that would be acceptable, I

5 would not find that objectionable, but I believe the question

6 was asking for what might be in his state of mind.

7     THE COURT: Let's tighten up the question. Go ahead.

8     MS. HESSMILLER: Thank you, your Honor.

9 BY MS. HESSMILLER:

10 Q. Trooper Sowa, when you were discussing Mr. Abbring's

11 addiction, what was the conversation? Can you tell us what

12 that conversation was about? What was he addicted to?

13 A. The downloading of child pornography.

14 Q. Was there any part of that interview where Mr. Abbring

15 mentioned he had only ever viewed 20 to 30 images?

16 A. I don't recall that.

17 Q. What was Mr. Abbring's demeanor during this interview?

18 A. Very calm, very honest, in my opinion. It appeared to me

19 the discussion of why we were there and our investigation was

20 almost a relief to him, that this is finally over.

21 Q. Did he say to you if you were the first person he had ever

22 talked to about this?

23 A. He did.

24 Q. Was this the first contact by law enforcement of

25 Mr. Abbring at his home for this investigation?

1  A.  I believe it is.

2      MS. HESSMILLER:  Thank you, your Honor.  Nothing

3  further.

4      THE COURT:  Mr. Gabry.

5      MR. GABRY:  Thank you.

6              CROSS EXAMINATION

7  BY MR. GABRY:

8  Q.  Trooper, I want to make certain there was no taped

9  interview of this conversation; is that correct?

10  A.  No, sir, there was not.

11  Q.  And the police report that was completed by you is the

12  full summary of that conversation?

13  A.  Yes, sir.

14  Q.  Okay.  And your training as a state trooper, when an

15  individual has something in quote marks when they are putting

16  your police report down, talking about what the defendant said

17  to you, do you also take the tact that when a specific

18  statement is being made by the defendant you put that in quote

19  marks?

20  A.  Could you-- I guess I'm a little confused on it sounds

21  like two different questions.

22  Q.  Well, I'm looking at your police report, and I see that

23  there are some times in the report where you say Brad stated,

24  and you put in quotes, "I do.  I would search for movies and

25  save them on a thumb drive." Unquote.  Other parts of the

1  report do not bear any information in quote marks.  Is the

2  intent of placing those quote marks on it because what you are

3  telling the reader of the report, that's specifically what he

4  said?

5  A.  That's correct.

6  Q.  Okay.  Is it also true in here that you do never

7  specifically ask him, did you masturbate to child pornographic

8  movies?

9  A.  I did ask him if he would ever masturbate.

10  Q.  While looking at what?

11  A.  I can't recall whether I actually said child pornography.

12  Q.  If I were to show you your report, would that refresh your

13  recollection?

14  A.  It would.

15  Q.  I'm referring to Page 2 of 8 of Trooper Sowa's report.

16  A.  Okay.

17  Q.  Did you ever specifically ask him the question in your

18  report:  "Did you look and masturbate to child pornographic

19  movies?"

20  A.  Not in the report, sir.

21  Q.  Okay.  This interview took place in your police van at

22  about 7:00 o'clock in the morning on the date of the execution

23  of the search warrant?

24  A.  That is correct.

25  Q.  A number of police officers came to the house and asked

1  Mr. Abbring to step out; is that correct?

2  A.  That is correct.

3  Q.  And you interviewed him in that van?

4  A.  Yes, sir.

5  Q.  Are you indicating to the Court that there was no

6  discussion about adult pornography between yourself and

7  Mr. Abbring?

8  A.  The only discussion was that this was not about adult

9  pornography.

10  Q.  So you never asked him about whether or not he downloaded

11  adult pornography, or had adult pornography, or masturbated to

12  adult pornography?

13  A.  No, sir, not that I recall.  No.

14  Q.  Okay.  What you do recall is that he said out of the six

15  year period, twice.  I believe that was your testimony, two

16  times I believe you said on your direct examination; is that

17  correct?

18  A.  Could you repeat that, please?

19  Q.  Well, first of all, in response to Miss Hessmiller's

20  question, did you indicate that Mr. Abbring told you he

21  masturbated to child pornography either twice or a couple of

22  times?

23  A.  I believe a couple of times, yes.

24  Q.  So when the indication is about what went on for six

25  years, this was not masturbation, this was the downloading of

1 this pornography?

2 A.  Correct.

3 Q.  Okay.  So out of six year period, he remembered doing it

4 two times?

5 A.  Correct.

6 Q.  Did you ask him to what kind of pornography, what ages of

7 the children, whether they were bondage type images or anything

8 like that?

9 A.  No, sir.

10 Q.  Okay.

11      MR. GABRY:  Nothing further, your Honor.

12      THE COURT:  Thank you.

13      Miss Hessmiller.

14            REDIRECT EXAMINATION

15 BY MS. HESSMILLER:

16 Q.  Trooper Sowa, did ages come up in the interview?  Did you

17 discuss ages of the child pornography?

18 A.  We did.

19 Q.  What was the context of that information?

20 A.  I asked him his preference of what types of videos he

21 would be searching for.  And if I recall right, I believe the

22 ages of 12 to 14 came up.

23 Q.  Boys or girls?

24 A.  I don't recall.

25 Q.  Would it help you remember if I showed you your report?

1   A.   Yes, ma'am.

2        Okay.  Thank you.

3   Q.   Were these 12 to 14 year old boys or girls?

4   A.   Girls, ma'am.

5        MS. HESSMILLER:  Thank you, your Honor.  Nothing

6   further.

7        THE COURT:  Mr. Gabry.

8        MR. GABRY:  No, thank you, your Honor.

9        THE COURT:  Trooper, you may step down, sir, with the

10  Court's thanks.

11       THE WITNESS:  Thank you, sir.

12       MS. HESSMILLER:  Your Honor, the government calls

13  Special Agent Tim Kruithoff.

14       THE COURT:  Agent, please step forward and be sworn.

15        TIM KRUITHOFF - GOVERNMENT WITNESS - SWORN

16       COURT CLERK:  Please be seated.

17       State your full name, spelling your last name for the

18  record.

19       THE WITNESS:  My name is Tim Kruithoff, and it's

20  spelled K-r-u-i-t-h-o-f-f.

21                  DIRECT EXAMINATION

22  BY MS. HESSMILLER:

23  Q.   Special Agent Kruithoff, what agency do you work for?

24  A.   I work for Homeland Security Investigations.

25  Q.   Were you involved in the investigation into Bradley

1  Abbring?

2  A.  Yes, I was.

3  Q.  Were you involved in the undercover download from Bradley

4  Abbring's IP address?

5  A.  Yes, I was.

6  Q.  When was the first time that you had achieved an

7  undercover download from Bradley Abbring's IP address?

8  A.  That occurred in July of 2012.

9  Q.  And were there multiple times or was that the only time?

10  A.  There were approximately four times.

11  Q.  Okay.  Do you remember the months of those downloads?

12  A.  I believe there was a couple in July of 2012, and I

13  believe September of 2012, and then I think the last one was in

14  June of 2013, I believe.

15  Q.  Was there one in February, 2013, as well?

16  A.  Yes.

17  Q.  And what did you download during those sessions?

18  A.  During those sessions, we had partial downloads of child

19  pornography.

20  Q.  And let me back up a step.

21      What program were you downloading on?

22  A.  I operate-- it's basically a law enforcement undercover

23  program that's based on Ares.  It's actually the Ares program

24  that's modified for law enforcement.  And then while on the

25  Ares network, we identified an IP address that was sharing

1  child pornography, and that's what occurred.

2  Q.  This is Ares, A-R-E-S?

3  A.  Yes, that is correct.

4  Q.  Is that a peer-to-peer sharing network?

5  A.  Yes.

6  Q.  You downloaded four times partial downloads, what does

7  that mean?

8  A.  The partial downloads, because when Mr. Abbring was

9  downloading his child-- the files from the Ares network, it

10  starts to, you know, it doesn't come all in one shot, it has to

11  download, you know, the file it takes awhile to download the

12  file.  And then as that file is being created on his computer

13  then we are also able to-- the Ares program, the law

14  enforcement Ares program is also able to start to download that

15  program from him as well.  And so what happened as the file

16  completed on Mr. Abbring's computer, it was then removed out of

17  the shared folder and then put to the external hard drive, and

18  then that-- once that action happens, that stops my download,

19  so I was never able to get a complete download.  It was always

20  partial downloads of the files.

21  Q.  Were you able to open those partial downloads?

22  A.  Yes, we were.

23  Q.  What were you able to open?

24  A.  We were able to--  The file that was partially downloaded,

25  we were able to open that and view what those files contained.

1  Q.  Were those videos or images that were partially

2  downloaded?

3  A.  They were videos.

4  Q.  So by partial downloads, does that mean only part of the

5  video was downloaded?

6  A.  That is correct, yes.

7  Q.  Were you able to view those videos on your undercover

8  computer?

9  A.  Yes, I was.

10  Q.  Did you see child pornography in those videos?

11  A.  Yes, I did.

12  Q.  Can you give us an example of what you saw from

13  Mr. Abbring's computer?

14  A.  I don't recall exactly what the names of the files were,

15  but from my forensic examination, I can tell you what I kind of

16  believe what they were, but I don't exactly know what those

17  files.

18  Q.  Would it help you to see the description in the search

19  warrant affidavit?

20  A.  Sure.

21  Q.  So for example, can you give us one example of what you

22  were able to view from one of the partial downloads?

23  A.  Yes.  One of the partial downloads, the video depicted

24  three to four-year-old female who was standing in the bathroom

25  initially touching her vagina and later in that video performs

1  oral sex on an adult male.

2  Q.   So by partial download, did that mean that you were just

3  not able to see the last part of that video?

4  A.   That is correct.

5  Q.   But you were able to see enough to see that activity that

6  you just described?

7  A.   That is correct, yes.

8  Q.   And is that the same for all of the download sessions from

9  July, 2012 to June, 2013?

10  A.   That is correct, yes.

11  Q.   Okay.  And then ultimately do you recall how many images

12  and videos the forensic examination discovered on Mr. Abbring's

13  devices?

14  A.   Yes, I do.

15  Q.   How many?

16  A.   During the forensic examination, the videos, I stopped

17  book marking the child pornography videos at 450.  There were

18  additional videos, but at that point, at the number like 450, I

19  stopped book marking.

20  Q.   How many images?

21  A.   The images I believe there are just under a thousand

22  images.  And again, that was-- I didn't review everything, but

23  that's kind of where I stopped book marking images.

24  Q.   Were the majority of those images boys or girls?

25  A.   Females.

1 Q. Were there images of bondage and sadomasochistic conduct?

2 A. Yes, there was.

3 Q. The Ares program, can you tell us a little bit more about

4 how it works, and I'll start with this. If a person is using

5 Ares, are they able to disable the share function?

6 A. No, they are not.

7 Q. Can you tell us why or how?

8 A. Well, the Ares program-- to install the Ares program, you

9 have to go out and search for it, you have to download it,

10 install it on your computer, and then once do you that, you get

11 access to what is called Ares network. And Ares network

12 comprises of other people around the world that are also

13 running the Ares program, and then you can share files. You

14 can type in key words and look, you know, and basically look

15 for whatever you want to look for, and then a list will come up

16 on your computer to tell you, you know, hey, these files are

17 available, and give you names of those files and then you can

18 click on those files to download those files.

19 Q. And if Mr. Abbring was removing files from his share

20 folder right after he downloaded them, is that one way that you

21 can prevent other people from downloading further from you?

22 A. It is, yes.

23 Q. But it doesn't prevent people from downloading what is in

24 your shared folder at that moment?

25 A. No, it dose not.

1  Q.  For Ares, if you're using Ares and you're downloading

2  files, there is no way to stop people from downloading those

3  files; is that correct?

4  A.  That is correct.

5  Q.  So unlike other peer-to-peer programs where you can

6  perhaps disable a share function and still use the program,

7  that feature does not exist in Ares?

8  A.  No, it does not.

9      MS. HESSMILLER:  Thank you, your Honor.  No further

10  questions.

11      THE COURT:  Mr. Gabry.

12      MR. GABRY:  Thank you.

13            CROSS EXAMINATION

14  BY MR. GABRY:

15  Q.  So Agent Kruithoff, if I understand your explanation, and

16  I'm probably terrible at analogies, but basically if I take one

17  of those cups of water and I start to pour the water into the

18  cup, before I remove that cup and stop that download, you,

19  because I am downloading, can start taking water out of the

20  cup?

21  A.  That is correct.

22  Q.  And that's, in your estimation, and obviously for the

23  Court, the term distribution, he is distributing those files

24  even though he doesn't have complete access to that file yet?

25  A.  I'm able to begin the download of that file, yes.

1   Q.   Okay.  And so are you indicating that he can't block

2   somebody.  If he stops the download, does that block you?

3   A.   You can stop the download, but you cannot turn off the

4   sharing function within Ares.  So there is not a setting that

5   can go in and say hey, do not share files from the share

6   folder.

7   Q.   Right.

8   A.   That option is not available.

9   Q.   And he never indicated that's what he was doing, he

10  indicated he was blocking people from downloading?

11  A.   I believe that was from the interview, yes.

12  Q.   And a way to block somebody is to stop the download when

13  somebody else--  Can you tell somebody is trying to take the

14  file when you're downloading it?

15  A.   Yes.

16  Q.   Okay.  And so there is action that can be taken to stop

17  the download, to stop the person from getting it?

18  A.   I believe so, yes.

19  Q.   In your forensic examination of the all of the media that

20  was taken from Mr. Abbring, is it not true that you did not

21  find any child pornography in the shared Ares folder on his

22  desktop?

23  A.   I did not find any child pornography in the shared folder,

24  that is correct.

25  Q.   It is true that the child pornography that you found, with

1  the exception, I think you mentioned in one of the reports,

2  there was some images on a phone?

3  A.  Yes.

4  Q.  But the majority of this, all volume we are talking about

5  had all been placed on what we have referred to as an external

6  hard drive?

7  A.  External hard drive and other pieces of removable media,

8  yes.

9  Q.  Okay.  I don't remember seeing a breakdown that it was on

10  other pieces of media other than the external hard drive.

11  A.  There were thumb drives, SD cards, those types of.

12  Q.  And they had child pornography on them?

13  A.  Yes, they did.

14  Q.  Okay.  Did you ever determine whether or not the video

15  players on the Abbring computer was able to view AVI files or

16  MPEG files?

17  A.  No, I was not.

18  Q.  Okay.  There was information in this shared Ares folder

19  when you did your investigation; is that correct?

20  A.  Information in the shared folder?

21  Q.  Files in the shared folder?

22  A.  You know, I don't recall.  I don't recall what was in the

23  shared folder.

24  Q.  Would you recall then if it was totally empty?  Would you

25  have not made note of that somewhere?

1  A.  I don't recall that either.

2  Q.  Okay.  Do you recall meeting with me?

3  A.  I do, yes.

4  Q.  Okay.  And you recall showing me various aspects of what

5  you found and going through the files and things of that

6  nature?

7  A.  Yes, I do.

8  Q.  Okay.  Now again, I'm not talking the legal term of art,

9  I'm talking about our conversation.  Did you not indicate to me

10  that there was no evidence of distribution and that was good

11  for him, but it sure helped establish knowledge of receipt,

12  that he knowingly was receiving these?

13  A.  I don't recall those exact words, but I do recall a

14  similar conversation.  I do recall a conversation, but as far

15  as no evidence of distribution on the computer, that is true.

16  Q.  It's true what we are talking about distribution meaning

17  that he sent files out, that he posted files somewhere that

18  were left for anybody to come look?

19  A.  That is correct, yes.

20  Q.  And you are not telling me that, you know, and I didn't

21  take it to mean that files weren't being grabbed as they were

22  being downloaded?

23  A.  Correct.

24  Q.  Okay.

25      MR. GABRY:  Thank you, your Honor.

1         THE COURT:  Thank you, counsel.

2         Ms. Hessmiller.

3         MS. HESSMILLER:  Nothing further, your Honor.

4         THE COURT:  All right.  Agent, you may step down,

5  sir, with the Court's thanks.

6         THE WITNESS:  Thank you.

7         (At 10:15 a.m., witness excused.)

8         THE COURT:  Any further proofs, Miss Hessmiller?

9         MS. HESSMILLER:  No, your Honor.  Thank you.

10         THE COURT:  Mr. Gabry, in light of the government's

11  evidence, do you wish to present any proofs?

12         MR. GABRY:  No, your Honor.

13         THE COURT:  All right.  Thank you.

14         Miss Hessmiller, I'll take your argument on the two

15  issues, distribution and acceptance.

16         MS. HESSMILLER:  Distribution and the acceptance,

17  your Honor?

18         THE COURT:  Yes, please.  Thank you.

19         MS. HESSMILLER:  I'll start with the distribution,

20  your Honor.  I hope that Special Agent Kruithoff's testimony

21  helped to clarify, and it sounds from the questions from both

22  sides that it did.  That the agent was able to download from

23  Mr. Abbring files that Mr. Abbring was currently downloading

24  that were residing in his shared Ares folder before he pulled

25  them out and put them on an external hard drive.  The water

1  analogy is a very good one.  Another analogy, one I thought of

2  was that this is something akin to a poker table.  That when

3  you join the Ares group, you're sitting down at a poker table,

4  you have to buy in.  The way you buy in is anything that you

5  receive is on the table for others to take while you're

6  receiving it.

7       There is no block function in Ares, so there are

8  other programs out there where a user can download in relative

9  privacy by blocking others from downloading from them.  Ares is

10  not that type of program, so an occupational hazard of using

11  Ares is that whatever you're in the process of downloading is

12  available to others, and that is the buy in for Ares.

13       Distribution for the two point enhancement does not

14  require intent.  There is a lot of caselaw on the five point

15  enhancement of whether a person is distributing with the

16  expectation of receiving something in return that's valuable.

17  For distribution, the mere posting of something to make it

18  available to others is sufficient without intent.

19       Here the way the Ares works and the way Mr. Abbring

20  was using it was that he was making files available, partial

21  download is somewhat of a misnomer as we learned from Special

22  Agent Kruithoff.  He was receiving child pornography that he

23  could play on his computer involving graphic depictions of

24  children involved in sexual conduct.  So this was not--

25       THE COURT:  Would you agree with me that this, based

1  on facts that I've heard, not only from the agent's testimony

2  but also from the nature of the statements in the presentence

3  report, that the factual pattern here is somewhat unique.  I

4  don't think I have personally as a federal judge have had a

5  case with this particular fact pattern.  Would you agree with

6  me on that?

7      MS. HESSMILLER:  I haven't seen one exactly like

8  this, your Honor.

9      THE COURT:  I mean typically, the situation is the

10  files are downloaded and they are sitting.

11      MS. HESSMILLER:  Sitting there.

12      THE COURT:  They are sitting there.  And they are

13  because of the nature of the program they are there to be

14  shared with other people in the Ares network.

15      MS. HESSMILLER:  Correct.

16      THE COURT:  In this situation, if I appreciate the

17  agent's testimony, and I guess it's your argument, that the two

18  level distribution occurred while the files were being

19  downloaded.

20      MS. HESSMILLER:  Correct.  But it did occur some four

21  or five times over the course of an entire year by one

22  undercover agent.  The undercover agent had the accessibility

23  to Mr. Abbring's file that anybody on Ares would have had

24  during any of those times.  So although Mr. Abbring was making

25  efforts to remove them from the shared file, he was not

1 removing them from the shared file soon enough such that

2 Special Agent Kruithoff couldn't get to them, possibly other

3 people as well using Ares may have also gotten them.

4 The presentence report indicates in Paragraph 27 that

5 6,500 files had passed through Mr. Abbring's Ares shared folder

6 at some point. Meaning that those were likely files that he

7 had downloaded from Ares, they resided in his shared folder for

8 at least a brief period of time, and any and all of those files

9 would have been available to others even while he was in the

10 process of downloading them.

11 I would suggest here, your Honor, that factually and

12 legally the two point enhancement does apply, but that I would

13 also agree that Mr. Abbring is not the most serious distributor

14 of child pornography, that he was making efforts to not make it

15 available to other people, perhaps unsuccessfully, but that may

16 be a consideration for your Honor in determining the degree to

17 which to range within the guideline sentence or below.

18 As for the acceptance issue, your Honor, Trooper Sowa

19 was present for the interview. He conducted the interview, and

20 he wrote the interview report. He was the first person to talk

21 to Mr. Abbring about this. He was the first law enforcement

22 officer to ever bring this topic up to Mr. Abbring. It was

23 during the execution of a search warrant, it was likely a

24 surprising emotional event to Mr. Abbring as indicated by later

25 portions of his report where Mr. Abbring became quite

1  emotional.  This was prior to Mr. Abbring having a chance to

2  think about what he should say.  This was prior to him going to

3  therapists that he would hope to quote at sentencing.  This was

4  prior to him getting a defense attorney.  This was prior to him

5  talking to the presentence investigator.  Trooper Sowa had the

6  first interaction with Mr. Abbring.  As is Trooper Sowa's

7  practice, the conversation focused on child pornography.

8  Trooper Sowa was not there to investigate adult pornography,

9  and the focus of the conversation was child pornography.

10      Mr. Abbring said that he would search for

11  approximately six years for girls around 12 to 14 years old, he

12  said that he went a year without looking at these things, but

13  he went back because access to the movies was just too easy.

14      During the context of that conversation, Mr. Abbring

15  said that he masturbated to these images at least-- a couple of

16  times.  And it sounds like he is going back.  It sounds from

17  the sentencing memorandum, the objection memorandum, and the

18  argument here, that he didn't know what they were talking

19  about, that he just brought up masturbating to some other thing

20  besides child pornography.  That's not believable, and is not

21  the testimony of Trooper Sowa.  That is an attempt by Mr.

22  Abbring to say that he did not get sexual gratification from

23  these images.  That he was searching for images, as he says in

24  his sentencing objection memorandum, because he himself had

25  been a victim as a young boy, and that he was somehow looking

1   for a community of other children who had undergone a similar

2   experience.

3       The images and video that Mr. Abbring was downloading

4   were graphic, predominately girl victims of child pornography.

5   There's descriptions in the presentence report describing

6   graphic sex acts, oral sex, masturbation of young girls on

7   adult males.  There were also images of bondage and

8   sadomasochistic conduct of young girls.  His explanation that

9   he was looking for some sort of community to relate to is

10  incredulous, it's offensive, it's not believable.  So it sounds

11  as though he is continuing to persist in his argument that he

12  was not receiving sexual gratification from downloading child

13  pornography for some six years from-- He didn't delete it from

14  his computer, he removed it and hid it and kept it on the

15  external devices.  Him persisting the argument of saying that

16  he doesn't know why he was doing that, but it wasn't for sexual

17  gratification, it's clearly denial of relevant conduct.  And

18  the government asks the Court to consider that in deciding

19  whether or not to offer the two point adjustment for

20  acceptance.  Thank you, your Honor.

21      THE COURT:  All right.  Thank you.

22      THE COURT:  Mr. Gabry, I'll give you the last word on

23  those issues if you want to take it, sir.

24      MR. GABRY:  Just briefly, your Honor.

25      First of all, in the opening, I guess statement, from

1  Miss Hessmiller, she mentioned Mr. Kruithoff found 6,500 files

2  or a thousand files, whatever number, there is no indication

3  whatsoever that those files were child pornography.  And to

4  presume that or to suspect that or anything just doesn't appear

5  to be appropriate.

6          As Agent Kruithoff said, Ares is used worldwide for

7  all sorts of things, including finding regular legal movies,

8  which is what Mr. Abbring, as one sees in the PSR, indicated

9  was how he first got exposed to finding how easy it would be to

10  find it.  He was using it for a number of things, but none of

11  that is recollection of the officers.

12          I'm not sure how to react to the comments well,

13  before he got a defense attorney, before he got a therapist.

14  If anybody comes in front of this Court at some point in time

15  that can specifically indicate that they got down a hundred

16  percent why they do what they do in this particular area of the

17  law I would like to see it.  I'm sure they have, in a number of

18  cases I've done, a wide range of explanations on how they got

19  into this.

20          So what do we do when we are trying to help an

21  individual deal with what he is going to be facing, and more

22  importantly deal with the problem that he has involved in that,

23  but we send them to qualified therapists.  In this situation,

24  we sent him to somebody that I've used before and there is a

25  detailed report in there.  The government, as I would

1 anticipate in bringing these types of cases always feels, it's

2 incredulous, he wouldn't do this, it wouldn't be for the

3 security blanket. A quote from the commission's report in

4 February, 2013. "The commission reported that some offenders

5 have non-sexual motivations from viewing child pornography,

6 including avoidance of stress or dissatisfaction with life. It

7 reported that recent studies showed that appropriate treatment

8 interventions are associated with a low rate of recidivism. It

9 is real. Not everybody who looks at this stuff is a dangerous

10 child molesting predator or going to become one. And

11 unfortunately, your Honor, and later on we will talk about the

12 guidelines, it seems like because of a starting off point

13 that's where we have got. Mr. Abbring, but for the volume of

14 what was found on that hard drive, would appear to be what we

15 would call a simple receipt guy, he is going out looking for

16 it. The vehicle nowadays is the peer-to-peer, but it's still

17 just searching and getting it. He is not in the chat rooms, he

18 is not using it for any kind of sexual gratification. The

19 testimony is that in this discussion, he mentioned twice, that

20 is the extent of it. He's indicated that he didn't, that he

21 felt that it was through adult pornography. The assessments

22 that bear out that he is being honest or at least he has all

23 the indicators of being honest would also indicate that. And I

24 don't want to go off into this legal argument, but is somebody

25 who views this stuff, and we see relevant conduct, I guess I

1  just, if we don't even score levels for masturbation versus

2  simple just possession or cataloging.  What was said that in

3  thing was said in that room.  I don't believe that he is lying

4  to anybody.  Is there some denial that's something that we can

5  ultimately find out, is he intentionally lying?  Your Honor, he

6  stepped up to the plate, has told the Court what he has done.

7  He is willing to accept the punishment of this Court.  I don't

8  know what more he can do to accept responsibility than realize

9  he is turned his back on his life, given the circumstances he

10  has been through, that's a huge step forward for this man.

11        THE COURT:  All right.  Thank you.

12        There are two objections before the Court.  First is

13  the application of the distribution sentencing guideline

14  enhancement, which is Sentencing Guideline Provision

15  2G2.2(b)(3)(F).  Based on the Sixth Circuit law, which the

16  court is aware of, the Court is going to overrule the

17  defendant's objection and apply the two level enhancement for

18  this particular case under these particular circumstances.  I

19  do that based on the testimony that the Court heard this

20  morning, as well as the descriptions of the defendant's conduct

21  contained in the presentence investigation report.

22        The Sixth Circuit law on this issue is fairly clear.

23  United States vs. Connor, at 521 Federal  Appendix 493, a 2013

24  Sixth Circuit case.  I recognize that case is unpunished, but

25  the Court finds it persuasive, as well as Ramos at 695 F.3d

1   1035 at Page 1041. "The knowing use of a sharing program that

2   allows access to child pornography files is sufficient to

3   warrant the two point increase." That is the Bolton case at

4   669 F.3d 780 at Page 783, as well as Connor, previously cited,

5   and Gerick, G-e-r-i-c-k, an unpublished case from the Sixth

6   Circuit, decided June 11, 2014.

7        The Court is aware of the series of Eighth Circuit

8   cases that the defendant has brought to my attention,

9   specifically Dodd and Durham, but there is no indication from

10  the Court's review of the caselaw that the Sixth Circuit has

11  adopted those approaches to the evaluation whether the

12  distribution enhancement ought to be applied. So accordingly,

13  the Court, based on the Sixth Circuit law that the Court is

14  required to apply to the legal decision of applying the

15  enhancement, the Court overrules the defendant's objection and

16  the two level enhancement will be applied. This is clearly not

17  a five level enhancement, of course, most of the caselaw

18  involving the application of the distribution enhancement

19  involve the application of the five level enhancement, but I do

20  believe two points is appropriate under the facts and

21  circumstances of the proofs before the Court this morning, as

22  well as the presentence report.

23        As far as acceptance of responsibility is concerned,

24  this is a close issue, because there are disturbing elements of

25  denial of relevant conduct based on this record. But I intend

1  to give the defendant the benefit of the doubt on this

2  particular issue. I will apply acceptance of responsibility.

3  The government has made the motion for the third level, which

4  will be granted, that makes the Offense Level 34, Criminal

5  History Category I. So I'm sustaining the defendant's

6  objection to the non-application of acceptance of

7  responsibility. As I say, this is close, and as I also

8  indicated moments ago, there is disturbing aspects of denial of

9  relevant conduct, but under the circumstances, in its totality,

10  I'm going to apply acceptance.

11      Accordingly, the Offense Level is 31, Criminal

12  History Category is I. The advisory guideline range is 151 to

13  188 months.

14      The defendant has filed a motion for a variance,

15  which I'm sure Mr. Gabry will address momentarily. That is ECF

16  Document 18. The Court has also had the benefit of Mr. Gabry's

17  sentencing memorandum as well as numerous attachments, plural,

18  to the sentencing memorandum having to do with letters from

19  individuals who clearly support Mr. Abbring as he stands before

20  the Court today.

21      So with that preface, Ms. Hessmiller, allocution on

22  behalf of the government.

23      MS. HESSMILLER: Thank you, your Honor.

24      Your Honor, in this allocution I think it's most

25  appropriate to focus on the victims. The defendant, as we

1  stated before, was downloading images for six years.  The

2  images in the charged in the Information have terms like PTHC,

3  which is pre-teen hard core.  PTHC five year baby come inside.

4  New PTHC private picks 13 year old daughter.  Horny toads best

5  CP-PTHC.  These images and videos were all submitted to the

6  National Center For Missing and Exploited Children, which

7  returned a report approximately 113 pages long identifying,

8  give or take 64 known child pornography victims in those images

9  and videos.  So at least 64 different children have to live

10  every day knowing that people are out there downloading and

11  viewing images and videos of their worst moment.

12        One of the victims-- several of the victims who were

13  identified in Mr. Abbring's collection of child pornography

14  submitted victim impact statements.  One of the victims wrote,

15  "I'm afraid that someone from the police will call and tell me

16  that they found more things or pictures on other people's

17  computers or in other cases that come up.  Every time someone

18  else sees pictures or videos of me, it feels like they are the

19  ones who hurt me to begin with, like they are the ones who did

20  this stuff to me.  Like they are my father, and they just want

21  to use me.  Like I'm just here for other people's pleasure.  If

22  you're looking at pictures or videos of me or any child, then

23  you're hurting everyone you look at.  You are the one abusing

24  us.  You are the one keeping my pain going for the rest of my

25  life."

1      And a second victim-- the second and final victim I

2   would like to quote from, your Honor, says, "My world came

3   crashing down the day I learned that pictures of me sexually

4   abused had been circulated on the internet.  Since then little

5   has changed except my understanding that the distribution of

6   these pictures grows bigger and bigger by the day, and there's

7   nothing I can do about it.  That enormity of this has added to

8   my grief and pain and given me a paranoia.  I wonder if the men

9   I pass in the grocery store have seen them.  I feel totally out

10   of control.  They are trading around my trauma like treats at a

11   party and it feels like I'm being raped all over again by every

12   one of them.  So many nights I've cried myself to sleep

13   thinking of a stranger somewhere staring that their computer

14   with images of a naked me on the screen.  I can never feel safe

15   so long as my images are out there.  Every time they are

16   downloaded I'm exploited again, my privacy is breached, and I

17   feel in danger again."

18      So by Mr. Abbring committing these crimes of

19   receiving these images of these victims, whose actual words

20   have just been quoted, Mr. Abbring is contributing to 64-plus

21   victims out there in the world walking around wondering if

22   every person they see has seen an image of them performing oral

23   sex on their father, being raped by somebody, sitting in the

24   back seat of a car masturbating a naked male.  These are all

25   images and videos that were found in Mr. Abbring's collection.

1    There was some contention earlier that the government

2    is at fault for not just charging possession.  Well, the

3    government doesn't charge possession if the defendant committed

4    receipt.  Mr. Abbring is the one who committed receipt, not the

5    government.

6    It's not the government's fault that Mr. Abbring is

7    sitting here today.  It's not Congress's fault that he is

8    facing this sentence.  It's Mr. Abbring's fault for whatever

9    reason in his childhood for deciding to re-victimize additional

10   children beyond the horrible sexual abuse that they already

11   went through, by continuing to proliferate and receive and

12   search for images of their abuse of these horrible terms and

13   really disturbing content.

14   So your Honor has all of the information available in

15   terms of making a decision on the motion for variance or the

16   within guideline sentence.  But I do think it's important to

17   keep in our memory the words of the victims in Mr. Abbring's

18   collection.

19   Thank you, your Honor.

20   THE COURT:  Thank you, counsel.

21   Mr. Gabry.

22   MR. GABRY:  Thank you, your Honor.  Counsel.

23   First of all, your Honor, let me say, you know, there

24   is a commonality to I guess our backgrounds.  In no way have I

25   ever, nor will I ever, nor do I ever convey to a client that

1  the punishments associated with this crime because of this

2  behavior are not appropriately set forward.  There is no

3  question here who is at fault.  There is a process to try to

4  resolve a case in the interests of a client that I have a duty

5  to do, and that's done, but that doesn't minimize or immunize

6  myself or my client from the plight of these young ladies.

7  There is something wrong with Mr. Abbring in that he would

8  spend the time to search out these images.  What could be

9  wrong?  That is, I believe, one of my responsibilities to see

10  what are we dealing with, and we have done that, I think, in

11  this case.  And I know the Court has sentenced hundreds of

12  individual, I've handled a number of cases, and there is a

13  commonality too that we hear, oh, I was abused as a child, and

14  that's brought up.  In no case that have I dealt with, either

15  as a prosecutor or as a defense attorney, have I seen such

16  firsthand effects on one of my clients of being a victim.  This

17  man understands what it is to be sexually assaulted.  Not only

18  that, but he understands this fear and this going forward that

19  occurs because-- because of his silence other children were

20  hurt.

21      The attachments that I attached to the sentencing

22  memorandum are done just to inform the Court that this is not

23  the old well, you know, my uncle did it once and nothing.  This

24  was a predator that this child ran into, and to the extent that

25  there was damage done, it wasn't addressed, it was self

1 medicated to an extent, by way of the emotional, I would say

2 lack of evolution of Brad Abbring, the demeanor, the way he

3 expresses himself, the calm concrete kind of attitude, but he

4 knows he did wrong. He knows that these are real human

5 beings. He understands that by him looking at those pictures,

6 and we had this conversation in my office not long ago, "You

7 could have been in the room, Brad, while it was happening.

8 That's what viewing it does. If you were actually in the room

9 and you were watching this child get assaulted, would you not

10 stop it? Would you not stop the man from doing that? Well, by

11 viewing these images, that's what you're doing." He

12 understands that. He wants to know why, and we did too. And

13 what we discovered, what we uncovered is that there was an

14 impact done. He does see the distinction between being the

15 person who created the initial harm, the attacker, and then the

16 difference between that person and the viewers. And that

17 doesn't minimize anything, and it's almost kind of a common

18 sense approach that but for you doing this, there wouldn't be

19 any images. So who is more at fault? Okay. That doesn't mean

20 he is not at fault by entering into this world instead of

21 getting help in a different fashion.

22      I've put together a sentencing memorandum that I hope

23 the Court sees some evolution as I've seen in some of these

24 cases. I noted with interest the, forgive me if I misspeak it,

25 in Bristline case, that talked about what kind of

1  considerations the Court needs to look at as far as varying

2  from the guidelines.  These are Congress's laws, I understand

3  that.  This five year mandatory minimum is Congress's law.

4  Where I suggest the Court can vary from and deviate from is how

5  the guideline was then created as far as the evolution to catch

6  up to that five year.  No difficulty whatsoever when we did it

7  were crack cocaine back in the '90s and said one year,

8  mandatory one year; gun law, mandatory two years; it's a

9  mandatory five years.  Where we got into this huge escalation

10  was a combination of factors of the change in technology, the

11  simplicity by which this stuff is landing in so many people's

12  files, and the fact that-- I'm sorry, the fact that the

13  commission in trying to fit the five year mandatory minimum in,

14  instead of just saying that this is going to cost you five

15  years, we are now going to adjust guidelines, and we are going

16  to add levels, and we are going to try to bring things up.

17        What I tried to present to the Court in my motion for

18  variance for factors for the Court to consider in looking at

19  the guidelines as we have discussed one area distribution, the

20  guidelines give a flat increase in levels for what could be a

21  person who leaves a file open with 450 videos and 1,000 images

22  sitting there for anybody to get and treats that person the

23  same as a person who is in the process of downloading files and

24  somebody else is glomming on as they are coming down.  Why do

25  we do that?  Well, my understanding is we escalate these

1  files-- or these levels in order to keep pace with, if we are

2  going to have a five year minimum, in order to get to the 60

3  months, we have to start at these base levels.

4      Once upon a time, as the sentencing commission report

5  indicates, and these are judges that are reacting to this, and

6  I understand the Court's position about this law, I truly do.

7  I also know, and I think the Court would agree that there is a

8  wide variance of opinion.  One thing that struck me was that I

9  cited in my memorandum is that remarks attributed to

10  Mr. Abbring were actually remarks attributed to an Oklahoma

11  district judge that talked about issues of possession and

12  simple receipt.

13      Mr. Abbring was charged with receipt, knowing

14  receipt.  The sentencing commission in its recommendations

15  basically indicates that they feel that knowing receipt is not

16  much different than simple possession, and that maybe they both

17  should have a lesser mandatory minimum, but that the mandatory

18  minimum of five is too harsh in some individual's opinions.  So

19  what.  That doesn't matter.  We are dealing with five.  My

20  question and my sentencing memorandum is, your Honor, what

21  number beyond five is sufficient, but not greater than

22  necessary to meet the sentencing factors of 3553.  And I hope

23  the Court in seeing that I tried to break them down in such a

24  way that we had a better picture of who Mr. Abbring was, not

25  just what we were able to get from the PSR interview.  Yes,

1  they are people that know him. Yes, they people that love him,

2  but they also know him, and they have talked about not

3  necessarily he didn't do it, you know, he is not that kind of

4  guy, but yes, they know he did it. They have their own ideas

5  why it might be this bad, but I wanted the Court to learn from

6  that the characteristics, the qualities of Mr. Abbring, to give

7  the Court a better view of who he is as a person. That there

8  is a decent bone that runs his spine, that helps people, that

9  tries to do the right thing. But something got disjointed and

10  he began to go into this world, and why? I think Randy Flood

11  gives us a pretty good indication as to why.

12          So when we look at those sentencing factors, first of

13  all, is he a danger to the public? Is he a danger to all of

14  these children that have submitted those statements? Well, he

15  certainly will be if he ever goes back to looking at these

16  images, which I think would be highly unlikely. But he's

17  certainly not a danger to the public in any other fashion.

18  What is incarceration going to mean to this man who's never

19  been locked up a day in his life? Thirty days is going to be

20  like 60. Use of progression, so at least let's weigh that as

21  we are trying to determine what kind of punishment is

22  necessary.

23          And that leaves us with one that, of course, we have

24  to address, and that is what do we say to the public? How do

25  we treat these individuals? Are we going to be able to deter

1 the public by handing down huge sentences, by taking him out of

2 his life basically without treatment for the large portion of

3 the sentence that the Court imposes, only to have him return to

4 the community at some point in time. Is that going to deter

5 people? I have my opinion, and the Court certainly has

6 theirs. My experience, not many people really think about this

7 when they start looking.

8       Yes, he needs to be punished. He understands he

9 needs to be punished. He has agonized over how to address this

10 to the Court. I'm just asking the Court to depart downward

11 from the guidelines as found, to put the sentence more in the

12 area of six, seven, eight years than into double digits. The

13 basis of that again is largely based on what I set forth not so

14 much attacking the guidelines, I'm not-- I'm moving away from

15 the idea of protect and the destabilization or the

16 deconstruction, I guess Mr. Stabenow called it of the

17 guidelines, but looking at the sentencing commission's own

18 reports that say there are some things here we need to fix.

19 Our guidelines aren't really helping our judges tell us who is

20 really dangerous, who really needs to be put away.

21       The percentages that I've attached in Exhibit 5 show

22 how over time they continue to escalate so that everybody,

23 pretty much everybody that the Court is going to see, because

24 the prosecutor determines, you know, they don't-- I have not

25 seen too many people that have been prosecuted for two images

1 or five images. Everybody the Court is going to see is going

2 to be doing double, triple, or maxing out for basically

3 receiving child pornography, not being in chat rooms, not

4 soliciting children. Where would there be a ceiling? If

5 Mr. Abbring did any of that, he should be hit harder, but under

6 these guidelines, you couldn't. You could go a few months. So

7 I think that is one of the policy concerns in the guidelines as

8 I see them, and as I believe other judges and the sentencing

9 commission sees them.

10   There is an interesting comment in the summaries that

11 deals with the idea as I already mentioned about knowing

12 receipt versus possession. It would be my contention that we

13 have a case here of knowing receipt, yes, a lot of files. We

14 don't downplay that. Yes, he has every right to be here, the

15 prosecutor has every right to decide given all of this. He

16 needs to be addressed by this Court. However, your Honor, the

17 guidelines in this case seem onerous without achieving any of

18 the responsibilities of the sentencing factors, and I would ask

19 the Court to depart downward more in the area of seven or eight

20 years.

21   THE COURT: Thank you, counsel.

22   Mr. Abbring, is there anything you wish to say in

23 your own behalf, sir? You may proceed as you wish.

24   THE DEFENDANT: Yes, I do, your Honor.

25   THE COURT: You may stand at the podium or remain

1   seated, whatever you like, sir.

2       THE DEFENDANT: Words alone can't express how sorry

3   and remorseful I am for what I have done.

4       I'm sorry. I'm extremely guilt ridden because of the

5   damage I've cause by downloading images. Because I downloaded

6   images, I have re-victimized them. I have caused pain and

7   suffering. Knowing their images are being downloaded makes

8   them relive their abuse. The impact on the children in the

9   files is an emotional scab, never healing because their images

10  or videos keep being downloaded tearing the scabs off and

11  causing them to relive the abuse again and again. They are

12  unable to escape their images and emotional devastation it

13  causes them. The victims live day-to-day knowing anyone they

14  see may have viewed their abuse. I feel terrible that I have

15  been a stumbling block in their recovery. It has been wrong of

16  me to ever download the files. I'm sorry.

17      Re-victimizing the kids in the images was the wrong

18  way to cover up what happened to me in my childhood. I could

19  relate and empathize to their abuse. It made my own abuse feel

20  insignificant. For 25 years I carried my abuse and never told

21  a sole. I wanted to hide my molestation from the world. I

22  thought people would judge me and treat me like another

23  statistic. I felt that if I came out with the abuse after the

24  other two boys were abused by Robert Gleason, they would be

25  angry at me, angry for not coming forward and preventing them

1  from the same devastation that I endured.  All of these years

2  I've carried the feelings of worthlessness, guilt, shame, and

3  remorse.  It caused me to be distant and an unemotional shell

4  of a man.  I've had a hard time trying to show my emotions over

5  the years.  I've tried so hard for so long to hide what

6  happened to me and the suffering I felt that when I do

7  generally feel emotions, they don't show.  Society has a stigma

8  that a man should be strong, tough, and not cry, but we forget

9  that we are all human and all hurt in some way.

10        I have been seeking long overdue help at what has

11  happened to me 25 years ago in Boy Scouts and what I have done.

12        I take full responsibility for my actions and the

13  consequences of them.  In group I have learned that I'm not

14  alone, and talking about my feelings is healthy.  It helps me

15  recover and become a stronger person.  It wasn't my fault what

16  happened to me, and it wasn't my fault what happened to the

17  other boys.  I thought they would be angry at me for not coming

18  forward, but if it was reversed, I know I wouldn't blame them,

19  they didn't molest me in a mess hall at Camp Gerber, Robert

20  Gleason did.  Still it is unacceptable, my choices I made to

21  cover my own pain.  It was selfish and wrong.

22        My heart aches for all of the children that have

23  suffered by other's and my actions.  I have prayed that the

24  victims of my actions can forgive me for what I have done.  I

25  have asked God for forgiveness for my sins every night and will

1  continue to until the day I die.

2         It was not right of me to use their abuse to cover up

3  my own abuse.  In counseling I have found my triggers and

4  identified the emotions they cause.  Instead of covering up my

5  emotions, I talk about them now.  People that I have had

6  surface relationships with now know the real me, supporting my

7  family and I.  With the help of my therapist, he has helped me

8  with anxiety and emotions caused by my triggers.  He has used

9  an eye movement desensitization and reprocessing, DMDR, as a

10  form of treatment that reduces emotional and physical symptoms

11  resulting from the disturbing or unresolved life experiences.

12  Now an item like a Boy Scout knife is just another knife.  I

13  don't have anxiety or a flood of emotions about my molestation

14  as I did before when I see it.  I'm deeply thankful for all of

15  the help.  I know with therapy, group meetings, family, church,

16  and friends supporting me, I will never feel worthless again.

17  Proverbs 24.6, "For waging war, you need guidance, and in

18  victory many advisors."

19         I have put myself in the shoes of the children abused

20  in the images I downloaded.  I understand their pain.  I never

21  wanted to hurt anyone.  I'm so sorry that I re-victimized them

22  by downloading images.  It makes me upset what I did.  I tried

23  to justify what I was doing, but I was wrong.  I know that I

24  will never do it again.  It's painful to talk about what

25  happened to me, so I know-- I know it's painful if there was a

1 reminder of abuse floating around in cyberspace to relive over

2 and over again.  I just wish there was some way I could tell

3 the victims the images I downloaded I'm sorry.

4       The impact of my actions is greater than I ever

5 imagined.  My own pain had put blinders on my perception of

6 what I doing.  Not only have I re-victimized all the kids in

7 the images, I have also created collateral victims.  My wife

8 will struggle to keep up the house.  She will struggle with the

9 bills that have me around it was really hard on her.  My

10  daughter will have a hard time.  I haven't been there to help

11  her, to support her, and family activities.  My parents will

12  also have a hard time not having their son to talk to and help

13  out when they need me.  My employer will be affected by my

14  actions.  I was a lead installer, problem solver, and go-to

15  guy.  All my family and friends will be affected and won't have

16  their weekend companion or someone they can count on.

17       The children are the main victims of what I've done.

18  My family and friends are collateral damage caused by my

19  actions.

20       I'm sorry for all the hurt, pain, and suffering I've

21  caused by my actions, I know I can't change the past, but I can

22  accept the responsibility for what I've done.  I want to heal

23  from what I've experienced and grow stronger for my family,

24  friends, and society.  I am a living testimony for speaking

25  out.  I want to help and I want to get help.

1    Job 17.9.  "Nevertheless the righteous will hold

2  their ways and those with clean hands will be stronger."

3    I would also like to apologize for my misplaced anger

4  in the letter to Senator Meekhof.  I had an overwhelming sense

5  of devastation.  I never intended to come across with such

6  anxt.  I misunderstood terms I used.  I'm sorry it was

7  unintentional.  The stress and anxiety I felt because of my

8  actions and the consequences of them, I was grasping for any

9  help I could get.  I wanted someone to hear me.  My intentions

10  weren't to have the punishment pardoned.  I alone am

11  responsible for what I've done.  I'm sorry.

12    I also want to apologize to the prosecutor and the

13  investigators for making them view the terrible images.  It

14  disgusts me to even think about what I have done, and in the

15  pain I've caused to the victims I downloaded.  Not only was it

16  devastating to the victims, it was immoral.  I pray that with

17  time everyone I have affected due to my actions will forgive

18  me.  I am deeply saddened for everyone involved with what I

19  have done.

20    I have had a year reflect on what I've done, and I

21  wish I would have told someone about my abuse earlier.  During

22  this last year, I have received and continue to receive therapy

23  and learn about the effects of my actions.  Every day I think

24  about what I did and the damage it has caused.  I've grown

25  spiritually and I have become closer to my family than ever

1  before.  With more help and support, I know I'll be a better

2  man, son, husband, father, employee.

3      Thanks to the Court and all involved for intervening.

4   It has forced me to face my past and to begin the long

5  journey of healing.  It has felt like I'm finally free of my

6  emotional prison.  Being caught led me to therapy and that's

7  helping me heal from my abuse.  I was hiding in the emotions I

8  repressed.  I was caught in the cycle of pornography.  Now with

9  the help and support I have received, I've been clean and sober

10  for 353 days to the date.  Without intervention by the courts,

11  I wouldn't have had met the five great therapists that would

12  help me on my road to recovery.  I have support now to grow,

13  change, and be the man God intended me to be.

14      Thank you, Judge Maloney, for your time and listening

15  to me this morning.  God has a plan for everyone, so I have a

16  faith in your decision.  God bless you.

17      THE COURT:  Thank you, sir.

18      It is the Court's duty to impose a sentence

19  sufficient, but not greater than necessary to comply with the

20  purposes of sentencing set forth 18 U.S. Code 3553(a).  The

21  Court recognizes the guidelines are advisory to the Court, but

22  I have taken the guidelines into account as an initial

23  benchmark or starting point when sentencing in this case.

24      I recognize I must make an individualized assessment

25  based on the facts presented.  The guideline range is one of

1  the array of factors warranting consideration.

2      I also fully recognize by discretion in determining

3  an appropriate sentence as recognized by the United States

4  Supreme Court in its decisions in Booker, Kimbrough, Rita,

5  Gall, Spears, and the recent Sixth Circuit case of

6  Herrera-Zuniga.

7      Pursuant to Tapia  vs. The United States, at 131

8  Supreme Court 2382, the Court recognizes that imprisonment is

9  not suitable for the purpose of promoting correction and

10  rehabilitation.

11      I have considered all of the defendant's arguments

12  in support of the his request for a lower sentence.

13      The 3553 factors are the nature and circumstances of

14  the offense and the history and characteristics of the

15  defendant.  The sentence must reflect the seriousness of the

16  offense; promote respect for law; provide just punishment for

17  the offense; afford adequate deterrence to criminal conduct;

18  protect the public from further crimes of the defendant;

19  provide the defendant with needed medical, educational, and/or

20  correctional treatment; the need to avoid unwarranted

21  sentencing disparity among similarly situated defendants; any

22  guideline policy statements that pertain and the kinds of

23  sentence available to the Court.

24      First, as far as recommendations to the Bureau of

25  Prisons is concerned, the Court recommends the defendant

1   receive a mental health assessment and treatment and counseling

2   deemed appropriate by the mental health professionals of the

3   Bureau of Prisons.

4        The Court has had the benefit of the report that was

5   attached to the defendant's submissions.  I have read that

6   report, and it's clear that this defendant needs continuing

7   assistance for his mental health difficulties.  I don't

8   minimize the progress that defendant has made since he was

9   confronted by law enforcement during the execution of the

10  search warrant.  It's clear to the Court that Mr. Abbring's

11  treatment and counseling will be of long duration, and

12  hopefully the professionals of the Bureau of Prisons will be

13  able to assist him.

14       In addition to that, I recommend that he be housed in

15  a facility as close to home as possible.  This is obviously a

16  case involving the application of the child pornography

17  guidelines as outlined in the defendant's submission of the

18  sentencing memorandum, as well as the request for a variance

19  from the advisory guideline range.  The child pornography

20  guidelines as promulgated by the sentencing commission are a

21  matter of very significant debate within the community of the

22  judiciary, law enforcement, and other commentators on the

23  federal criminal justice system.

24       Many of the enhancements that we have been talking

25  about here today are as a result of passage of a statute by the

1  Congress of the United States signed by the President of the

2  United States, which significantly increased the sentences for

3  these crimes.  These matters, in terms of the passage of a

4  statute, and in the unusual circumstance of actually writing

5  into the statute additional enhancements to the child

6  pornography guideline is a matter within the discretion of the

7  legislative branch of government and the executive branch of

8  government.

9       Now, I recognize that these guidelines are advisory

10  to the Court, and just to make it absolutely clear, I recognize

11  that Mr. Gabry during the course of his presentation was not

12  asking me to depart or vary as a result of a policy

13  disagreement, but to the extent that that might be a part of

14  the written presentation, I want to indicate for the record, as

15  I have on many other cases of this nature, that I do not have

16  any policy disagreements with the child pornography guidelines

17  as they are presently written.

18       I also recognize that the sentencing commission has

19  issued a very detailed report on this issue, but I also note

20  that there are not, since the promulgation of that report,

21  there have not been significant changes to the guidelines.  As

22  far as I know, the sentencing commission has not promulgated

23  possible amendments to the guidelines, so this is a matter

24  which is extant at the moment, but the state of the guidelines

25  at this point are ones which the Court does not have any policy

1  disagreement.

2      The defendant clearly has very solid family and

3  community support in the community, undoubtedly he will need to

4  lean on that support while he is in the institution and, of

5  course, he will need that support once he is released on

6  supervised release to the Court.

7      The defendant has a significant work history, no

8  doubt about that as well.  He has been in many aspects a

9  positive contributor to society.  He has expressed remorse for

10  his crime today in a very eloquent allocution before the

11  Court.  I have no reason to disbelieve his expressions of

12  remorse as they were presented to the Court today.  I do note,

13  however, that that was-- that is in some contrast to his

14  initial reactions when he realized that he was going to be

15  prosecuted federally.

16      But I think the defendant at this point has a much

17  better understanding of the nature of his crime and the

18  re-victimization of the youngsters that are depicted in the

19  video and images which are attendant to this particular case.

20      With treatment and with the defendant taking to heart

21  that treatment and executing the tools that he will undoubtedly

22  learn to avoid this circumstance in the future.  Assuming all

23  of those things happen, I do not think the defendant is a

24  threat to re-offend.  So protection of the public from further

25  crimes of the defendant, in the Court's judgment, at this

1 particular circumstance given the prospects for treatment and

2 the fact that the defendant seems committed to that treatment,

3 protection of the public is not a major factor for the Court to

4 consider here, and does form a basis for some variance from the

5 guidelines in the Court's judgment as well as the notion of

6 specific deterrence of Mr. Abbring, which again, I think given

7 the circumstances that I've just described, and of course at

8 this point these are hopes of the Court and expectations of the

9 Court, it's up to Mr. Abbring to execute the treatment program

10 in the future. But specific deterrence of Mr. Abbring again is

11 a minimal aspect to the Court's consideration of the 3553

12 factors.

13      On the other hand, general deterrence of others who

14 might contemplate similar activity is a major factor for this

15 Court to consider. I recognize Mr. Gabry's argument to the

16 contrary that individuals who engage in this activity probably

17 don't care. They don't think they are going to get caught, and

18 to a certain extent that might be true. But on the other hand,

19 the clear firm signal needs to be sent that if you engage in

20 this sort of activity which involves the re-victimization of

21 children as young as three and four years old, that you are

22 going to receive a significant sentence.

23      This crime is serious. The Congress of the United

24 States has set this crime at a mandatory minimum of five years,

25 that's a clear indication that the Congress of the United

1   States believes this criminal conduct to be serious, as well as

2   the executive branch of government.  And the issue for the

3   Court, of course, is finding the appropriate measure of just

4   punishment which would reflect the seriousness of the offense;

5   promote respect for law; provide protection of children in the

6   future which, of course, is one of the major purposes of the

7   law, and that, of course, is difficult for the Court to

8   decipher.

9       This is a situation where the defendant has no prior

10  record.  He is a Criminal History Category I.  That is the

11  purpose of Criminal History Category I, is to find a place in

12  the advisory guidelines for individuals who do not have a prior

13  record.  If he had a prior record, of any sort, his beyond one

14  point, his advisory guideline range would be even higher than

15  it is today.  But I do intend to grant a variance to the

16  advisory guidelines in this case, because I believe that under

17  the constellation of circumstances before the Court, that a

18  variance of some measure is appropriate, because it would

19  provide just punishment for the offense and be a sentence

20  sufficient, but not greater than necessary to comply with the

21  purposes of sentencing set forth in 3553(a).

22      Accordingly, it's the judgment of the Court the

23  defendant be committed to the custody of the Bureau of Prisons

24  to be imprisoned for a term of 132 months.

25      Upon release from imprisonment, the defendant shall

1   be placed on supervised release for a term of eight years.

2        Within 72 hours of release from custody of the Bureau

3   of Prisons, the defendant shall report in person to the

4   probation office in the district to which he is released.

5        While on supervised release, the defendant shall

6   comply with the mandatory and standard conditions of

7   supervision including sex offender registration, DNA

8   collection, drug testing is suspended-- I'm sorry, it's a

9   mandatory condition under the statute, drug testing.  There

10  shall be no firearms, destructive devices, or dangerous

11  weapons.

12       Additionally, the defendant shall comply with the

13  following special conditions of supervision:

14       Provide his probation officer with access to any

15  requested financial information, participate in sex offender

16  assessment and/or treatment as approved by his probation

17  officer, which may include physiological testing such as

18  polygraph, plethysmograph, and/or ABEL assessment.  The

19  defendant will contribute to the cost of the treatment in an

20  amount approved in advance by his probation officer.

21       The defendant's residence and employment shall be

22  pre-approved by his probation officer.

23       He shall provide his probation officer with access to

24  any requested financial information, including but not limited

25  to, credit reports, credit card bills, bank statements, and

1 telephone bills. The purpose of this condition is to monitor

2 Mr. Abbring's use of his telephone, his credit card, and other

3 things to make sure that he is not accessing materials that he

4 should not be accessing while he is on supervision.

5      He shall not associate with or have any contact with

6 convicted sex offenders, unless in a therapeutic session, and

7 with the permission of his probation officer.

8      The defendant shall have no contact with minors under

9 the age of 18 without the written approval of his probation

10 officer, and shall refrain from entering into any areas where

11 children frequently congregate, including, but not limited to

12 schools, daycare centers, theme parks, theaters, and

13 playgrounds.

14      The defendant shall not date or socialize with anyone

15 who has children under the age of 18 without the prior

16 permission of his probation officer.

17      He shall not possess or publicly display any

18 materials that may be viewed as lures for children, including,

19 but not limited to, children's games, toys, videos, or

20 clothing, without the prior permission of his probation

21 officer.

22      He shall not possess any materials depicting sexually

23 explicit conduct as defined in 18 U.S. Code 2256(2)(a)(I)-(v),

24 including visual, auditory, telephonic, or electronic media,

25 and/or computer programs or services. He shall not patronize

 1  any place whose primary purpose is to promote such materials or

 2  entertainment.  The defendant shall not utilize 900 or adult

 3  telephone numbers or other sex-related numbers.

 4        The defendant shall advise his probation officer of

 5  all pornographic materials owned or possessed by him, and shall

 6  not own or possess any sexually stimulating or sexually

 7  oriented materials deemed inappropriate by his probation

 8  officer and/or treatment staff.

 9        The defendant shall not possess or use a computer or

10  have access to any on-line service without the prior written

11  approval of his probation officer.  The defendant shall

12  identify all computer systems, internet-capable devices, and

13  similar memory and electronic devices to which the defendant

14  has access, and allow installation of a computer and internet

15  monitoring program.  Monitoring may include random examinations

16  of computer systems along with internet, electronic, and media

17  storage devices under the defendant's control.  The computer

18  system or device may be removed for a more thorough

19  examination, if necessary.  The defendant shall contribute to

20  the cost of such monitoring services, based on the defendant's

21  ability to pay, as deemed appropriate by his probation

22  officer.

23        The defendant shall participate in a program of

24  mental health treatment, as directed by his probation officer,

25  until such time as the defendant is released from the program

1  by his probation officer, and shall pay at least a portion of

2  the cost according to his ability to pay, as determined by his

3  probation officer.

4        The defendant shall use only those computers and

5  computer-related devices, screen user names, passwords, email

6  accounts, and internet service providers, as approved by his

7  probation officer.  Computers and computer-related devices

8  include, but are not limited to, personal computers, personal

9  data assistants, internet appliances, electronic games, and

10  cellular telephones, as well as their peripheral equipment,

11  that can access, or be modified to access, the internet,

12  electronic bulletin boards, or other computers or similar

13  devices.

14        The defendant will submit any personal computer owned

15  or controlled by him to a search conducted by his probation

16  officer or designee, at a reasonable time and in a reasonable

17  manner, without prior notice or search warrant, to determine if

18  the defendant has added, removed, updated, re-installed,

19  repaired, or otherwise modified the hardware or software on the

20  computers or hid encrypted files or data inconsistent with the

21  conditions of supervision.

22        The defendant shall provide all computer-related

23  billing records, including telephone, cable, internet,

24  satellite, and the like, as requested by his probation

25  officer.  Refusal to submit to such search is a violation of

1  the conditions of supervision.

2       The defendant will warn anyone with whom he shares

3  residence that the premises may be subject to searches pursuant

4  to this condition.

5       The defendant shall comply with the sex offender

6  registration requirements of the State of Michigan and any

7  other state in which he may reside while on supervision.

8       Special assessment of $100 is ordered due and payable

9  immediately.

10      The Court does not intend to impose a fine in this

11  case.

12      Pursuant to prior order of the court the government

13  has indicated it's not seeking restitution, which of course

14  would be mandatory under the statute, if requested.  The

15  defendant concurs in that position accordingly restitution is

16  not ordered.

17      Mr. Gabry, any other recommendations to the Bureau of

18  Prisons that you would like?

19      MR. GABRY:  No, your Honor.

20      THE COURT:  Any legal objections to the sentence

21  imposed?

22      MR. GABRY:  No, your Honor.

23      THE COURT:  Are you satisfied I've addressed the all

24  of your arguments on the record?

25      MR. GABRY:  Yes, you have, your Honor.

1    THE COURT:  Thank you.

2    Ms. Hessmiller, any legal objections to the sentence

3  imposed?

4    MS. HESSMILLER:  No, your Honor.

5    THE COURT:  Are there counts to be dismissed?

6    MS. HESSMILLER:  No, your Honor.

7    THE COURT:  Thank you.

8    Mr. Abbring, I advise you, sir, you can appeal your

9  conviction if you believe that your guilty plea was somehow

10  unlawful or involuntary, or if there is some other fundamental

11  defect in the proceeding not waived by your guilty plea.

12    You also have a statutory right to appeal your

13  sentence under certain circumstances, particularly if you think

14  the sentence is contrary to law.  However, a defendant may

15  waive these rights as part of a plea agreement, and you have

16  entered into a plea agreement, which waives some or all of your

17  rights to appeal the sentence itself.  Such waivers are

18  generally enforceable, but if you believe the waiver is

19  unenforceable, you can present that argument to the appellate

20  court.

21    You have the right to apply for leave to appeal in

22  forma pauperis if you are poor, if you wish to do so, with a

23  few exceptions, you need to file the appropriate documents

24  within 14 days of the entry of the judgment in this case.  Your

25  attorney will prepare and file notice of appeal upon your

1  request.

2      Counsel is advised of his obligation to advise his

3  client of his appellate rights.  Should your client wish to

4  pursue an appeal, the forms for filing an appeal can be found

5  on this Court's website or the Court of Appeals website.

6  Should your client choose to appeal, you are obligated to

7  continue representation of him until such time as you are

8  specifically relieved by the Court of Appeals.

9      There is one more issue involving remand or self

10  surrender.  This is a mandatory remand case.  Miss Hessmiller,

11  what is your position?

12      MS. HESSMILLER:  The government asks that the

13  defendant be remanded at this time, your Honor.

14      THE COURT:  Mr. Gabry?

15      MR. GABRY:  We were prepared, your Honor.  I don't

16  believe I have any extraordinary circumstances I need to

17  address with the Court.

18      THE COURT:  Thank you.

19      The defendant will be remanded to the custody of the

20  marshal.

21      Anything further, Miss Hessmiller?

22      MS. HESSMILLER:  No, your Honor.

23      THE COURT:  Mr. Gabry?

24      MR. GABRY:  No, your Honor.

25      THE COURT:  Thank you.

1     Good luck to you, sir.

2     COURT CLERK:  All rise, please.

3     Court is adjourned.

4     (At 11:20 a.m., proceedings were concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1

2

3

4

5                REPORTER'S CERTIFICATE

6

7

8        I, Kathleen S. Thomas, Official Court Reporter for

9    the United States District Court for the Western District

10   of Michigan, appointed pursuant to the provisions of Title

11   28, United States Code, Section 753, do hereby certify

12   that the foregoing is a true and correct transcript of

13   proceedings had in the within-entitled and numbered cause

14   on the date hereinbefore set forth; and I do further

15   certify that the foregoing transcript has been prepared by

16   me or under my direction.

17

18

19

20            /s/

21        _____

22        Kathleen S. Thomas, CSR-1300, RPR
          U.S. District Court Reporter
23        410 West Michigan
          Kalamazoo, Michigan   49007
24

25